**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| DANIEL WOOD, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>MEDLINE INC., JAMES M. BOYLE, and MICHAEL B. DRAZIN,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

Plaintiff Daniel Wood ("Wood" or "Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, alleges against Defendants (as defined below) the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, warning letters, recall notices, and other public records of the United States Food and Drug Administration ("FDA"), press releases and media published by and regarding Medline Inc. ("Medline" or the "Company"), analysts' reports and advisories about the Company, and other readily obtainable publicly-available information. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION AND OVERVIEW

1. This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Medline Class A common stock between December 16, 2025, and August 4, 2026, both dates inclusive (the "Class Period") seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its senior officers.

2. Medline is the largest provider of medical-surgical ("med-surg") products and supply chain solutions in the United States. The Company sells approximately 190,000 products under its own "Medline Brand," roughly one-third of which it manufactures in its own facilities and the balance of which it sources from a network of hundreds of third-party manufacturers

around the world. Many of these products, including syringes, surgical kits, and pre-operative antiseptics, are regulated by the FDA as medical devices or drugs.

3. Throughout the Class Period, Defendants assured investors that Medline's quality systems were effective. In the offering documents for its December IPO, Medline told investors that its "quality control team is integrated and embedded across our manufacturing and sourcing locations," and that the team's "expertise ***ensures that every product bearing the Medline brand meets both our rigorous quality standards and our customers' expectations***." After quality problems began to surface publicly, Defendants doubled down, telling investors that the Company's "recalls today are immaterial to our financials," that there was "***nothing systemic at all***" about the FDA's findings, and that quality remediation was "not going to be material to our numbers."

4. These and other similar statements about the Company's business, operations, and prospects were materially false and misleading. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Medline's quality control procedures were deficient; (ii) the FDA had repeatedly notified Medline of serious, recurring failures in its quality systems across multiple facilities; and (iii) as a result, Defendants' public statements were materially false and misleading at all relevant times.

5. The truth began to emerge on June 2, 2026, when the FDA publicly released a warning letter to Medline concerning one of its manufacturing facilities. The FDA found that Medline had failed for years to determine the root cause of, and prevent the recurrence of, bacterial contamination in a product used to prepare patients for surgery and concluded that "[t]hese repeated failures at multiple sites demonstrate that management oversight and control over the manufacture of drugs is inadequate." On this news, Medline's stock fell $2.56 per share, or approximately 7.2%, to close at $33.19 per share on June 2, 2026.

6. Defendants continued to minimize the problem. Days after the June 2 disclosure, Medline's Chief Financial Officer ("CFO") Defendant Michael B. Drazin ("Drazin") told investors that "there's no recurring theme. There's nothing systemic at all that we would be worried about." Medline's Chief Executive Officer ("CEO") Defendant James M. Boyle ("Boyle") assured investors that quality remediation was "not going to be material to our numbers" and that Medline was "still confident in our guidance."

7. Then, on August 5, 2026, Medline announced that it was lowering its fiscal year 2026 Adjusted EBITDA guidance by $200 million at the midpoint, from $3.5 billion – $3.6 billion to $3.3 billion – $3.4 billion, citing, among other things, "quality investments" and "quality remediation efforts." Defendant Boyle disclosed that Medline had "proactively engaged with the FDA to discuss and launch our global quality action plan," and that the Company had "modified our complaint review process, which we expect will increase medical device reporting or MDR submissions in the second half of the year." Defendant Drazin disclosed that the Company had "identified and quantified expected remediation costs," and that "a portion of the impact relates to products that were taken off the market due to recalls and/or FDA inspection findings."

8. On this news, Medline's stock fell $7.53 per share, or approximately 17.9%, over two trading sessions, to a close of $34.51 per share on August 6, 2026.

9. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## II. JURISDICTION AND VENUE

10. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

11. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

12. Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b). Medline maintains its corporate headquarters at 3 Lakes Drive, Northfield, Illinois, in this District, and many of the acts and omissions alleged herein, including the preparation and dissemination of materially false and misleading statements, occurred in substantial part in this District.

13. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III. PARTIES

14. Plaintiff, as set forth in the Certification hereto as Exhibit A, acquired Medline common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

15. Defendant Medline is a Delaware corporation with principal executive offices located at 3 Lakes Drive, Northfield, Illinois 60093. The Company's Class A common stock trades in an efficient market on the NASDAQ under the ticker symbol "MDLN."

16. Defendant Boyle has served as Medline's CEO and as a member of its Board of Directors at all relevant times.

17. Defendant Drazin has served as Medline's CFO at all relevant times.

18. Defendants Boyle and Drazin are collectively referred to herein as the "Individual Defendants."

19. The Individual Defendants possessed the power and authority to control the contents of Medline's SEC filings, press releases, and other market communications. The

Individual Defendants were provided with copies of Medline's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with Medline, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

20. Medline and the Individual Defendants are collectively referred to herein as "Defendants."

## IV. SUBSTANTIVE ALLEGATIONS

### A. Background

21. Medline describes itself as "the largest provider of med-surg products and supply chain solutions serving all points of care." The Company operates through two segments. Its Medline Brand segment offers approximately 190,000 med-surg products, which are "primarily Class I and II medical devices." Its Supply Chain Solutions segment distributes approximately 145,000 third-party products.

22. The Company produces approximately one-third of Medline Brand products in its own manufacturing facilities and sources the other two-thirds from a global network of third-party manufacturers. As of December 31, 2025, Medline operated 30 manufacturing facilities and worked with more than 600 global sourcing partners across approximately 40 countries.

23. Because many Medline Brand products are regulated medical devices or drugs, Medline's facilities and procedures are subject to periodic FDA inspection for compliance with the agency's Quality System Regulation for devices (21 C.F.R. Part 820) and Current Good Manufacturing Practice ("CGMP") regulations for drugs (21 C.F.R. Parts 210 and 211). At the

conclusion of an inspection, FDA investigators may issue a Form FDA 483 listing inspectional observations. If the FDA concludes that violations are significant and that a company's response is inadequate, it may issue a warning letter.

24. On December 16, 2025, the SEC declared effective Medline's registration statement for its IPO. In the IPO, Medline sold more than 216 million shares of Class A common stock to the public at $29.00 per share, for gross proceeds of approximately $7.2 billion, in what was reported to be the largest IPO of the year.

### B. Materially False and Misleading Statements Issued During the Class Period

25. The Class Period begins on December 16, 2025, when the SEC declared effective Medline's registration statement on Form S-1 for the IPO.

26. In describing the Medline Brand segment, the IPO registration statement stated:

> We produce approximately one-third of Medline Brand products . . . through our 33 manufacturing facilities . . . . For the vast majority of the other two-thirds of Medline Brand products, we utilize a network of more than 500 global partners across a diversified set of approximately 40 countries . . . . ***Taken together, our self-manufacturing capabilities and differentiated global sourcing relationships result in high-quality products while allowing us to manage costs.***

27. The IPO registration statement further stated:

> We are committed to delivering products of the highest standard, which is reflected by our robust quality team of over 2,400 employees. ***Our quality control team is integrated and embedded across our manufacturing and sourcing locations. Their expertise ensures that every product bearing the Medline brand meets both our rigorous quality standards and our customers' expectations***, as evidenced by our over 99.99% complaint-free rate.

28. The IPO registration statement purported to warn that Medline's facilities "and those of our suppliers are also subject to periodic inspections by the FDA," and that "the results of these inspections can include, and have in the past included and presently include, notices of inspectional observations (FDA Form 483s), warning letters, or other forms of enforcement." This risk warning was a generic, catch-all provision that was not tailored to Defendants' actual known

risks regarding the quality assurance issues the FDA had flagged in multiple Form 483s throughout 2025.

29. On February 25, 2026, Medline filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for its fourth quarter and fiscal year ended December 31, 2025 (the "2025 10-K"). The 2025 10-K stated:

> We are also committed to delivering products of the highest standard, which is reflected by our robust quality team embedded across our manufacturing and sourcing locations. The expertise of our research and development team and quality team helps ensure products bearing the Medline brand meet both our rigorous quality standards and our customers' expectations.

30. Appended as exhibits to the 2025 10-K were signed SOX certifications, wherein Defendants Boyle and Drazin certified that the 2025 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

31. On April 7, 2026, the FDA publicly posted a warning letter, dated March 25, 2026, and addressed to Defendant Boyle, concerning one of the Company's manufacturing facilities (the "March 2026 Warning Letter"). The FDA found that Medline's NAMIC-branded angiographic syringes were "adulterated" because Medline's manufacturing methods and controls did not conform to the Quality System Regulation; that Medline "did not take actions commensurate with risk"; and that Medline's response was "not adequate." The FDA also found visible particulate accumulation on manufacturing equipment in clean rooms and noted "approximately 114 complaints regarding foreign matter or hair in the package or device from December 2023 to at least December 1, 2025." The FDA warned that the violations "may be symptomatic of serious problems in your firm's manufacturing and quality management systems."

32. On April 14, 2026, Medline published its Code of Conduct & Ethics (the "Code"), which opened with a letter signed by Defendant Boyle. Under the heading "Regulatory Compliance," the Code stated:

> Our product safety processes are strictly regulated by government agencies to promote consistent, high-quality production and prioritize the health of the patient. ***We maintain robust quality management systems designed to meet all applicable regulatory compliance regulations and standards set by the U.S. Food and Drug Administration***, its international counterparts and similar regulatory bodies in the countries where we operate.

33. Under the heading "Patient Safety," the Code further represented that "[i]f any product safety concern arises, it will be evaluated and escalated as necessary to appropriate public health and regulatory authorities."

34. On May 6, 2026, Medline hosted a conference call with investors and analysts to discuss its first quarter 2026 results (the "Q1 2026 Earnings Call"). During his prepared remarks, Defendant Boyle stated:

> Our Medline brand includes approximately 190,000 products, supported by an increasingly diversified global supplier network. Today, nearly 90% of our Medline brand products are multi-sourced, up 10 percentage points from five years ago. ***This scale and complexity require constant and rigorous supply chain, quality and regulatory discipline. For us patient safety and product quality come first.*** Our customer complaint rate is less than one complaint per million units sold well below Six Sigma benchmarks.
>
> Any Medline recall is an action we believe is in the best interests of patients and our customers made in close coordination with regulators and designed to minimize risk and disruption. ***Our recalls today are immaterial to our financials.*** We remain committed to building the most broad and robust supply chain in the industry to enhance resiliency and regulatory compliance across our network, and to better position Medline to navigate global complexities.

35. During the same call, Defendant Drazin reaffirmed Medline's full-year Adjusted EBITDA guidance of $3.5 billion to $3.6 billion. Neither Defendant disclosed that the Company would need to make material investments to remediate deficiencies in its quality systems.

36. Defendants' statements, referenced in ¶¶25-35, were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to

disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Medline's quality control systems were instead deficient across multiple manufacturing facilities, as the FDA had repeatedly notified the Company; (ii) Medline had repeatedly failed to sufficiently address product defects; (iii) as a result, Medline would be required to make investments to remediate its quality systems; and (iv) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**C. The Truth Begins to Emerge**

37. On June 2, 2026, the FDA publicly posted a warning letter, addressed to Defendant Boyle and dated May 28, 2026, concerning the Company's Waukegan manufacturing facility (the "May 2026 Warning Letter"). The May 2026 Warning Letter "summarizes significant violations of Current Good Manufacturing Practice (CGMP) regulations for finished pharmaceuticals," and found that Medline's drug products were adulterated.

38. The FDA found that Medline had "failed to adequately investigate and implement corrective actions and preventive actions (CAPA) to determine root causes and prevent recurrence of these repeated contamination incidents," and that this issue "was cited on the previous Form FDA 483 issued to your firm in January 2025 and subsequently discussed during the most recent regulatory meeting held with your firm in May 2025." The FDA deemed Medline's response "inadequate because you have not explained why your previous CAPA attempts were not successful," and stated that "[y]ou have unsuccessfully attempted similar corrective actions in the past."

39. The FDA further found that Medline's "manufacturing operators engaged in practices that pose significant contamination risk," such as "using cleaning tools without suitable gloves and then repeatedly touching" product; that operators "have routinely deviated from

procedures for cleaning and disinfection"; and that Medline's "manufacturing processes and cleanroom environments are inadequately designed to assure an ongoing state of control."

40. Critically, under the heading "Repeat Observations at Multiple Sites," the FDA stated:

> FDA cited similar CGMP observations at other facilities in your company's network, including inadequate investigations into OOS results at your Hartland, Wisconsin site. ***These repeated failures at multiple sites demonstrate that management oversight and control over the manufacture of drugs is inadequate.***
>
> ***Your executive management remains responsible for fully resolving all deficiencies*** and ensuring ongoing CGMP compliance. You should immediately and comprehensively assess your company's global manufacturing operations to ensure that systems, processes, and the products manufactured conform to FDA requirements.

41. The FDA directed Medline to provide, among other things, "[a] comprehensive, independent risk assessment of all contamination hazards," "[a] comprehensive, independent assessment of your overall system for investigating deviations, discrepancies, complaints, out-of-specification (OOS) results, and failures," and "[a]n independent assessment and remediation plan for your CAPA program."

42. On this news, Medline's stock fell $2.56 per share, or approximately 7.2%, to close at $33.19 per share on June 2, 2026.

43. The May 2026 Warning Letter only partially revealed the truth. Defendants immediately sought to reassure the market that the FDA's findings were isolated and financially immaterial, thereby continuing to maintain artificial inflation in the price of Medline stock.

44. On June 3, 2026, Defendant Drazin appeared on behalf of Medline at the William Blair Growth Stock Conference. An analyst asked: "[T]here was another warning letter a month or two ago on a different facility . . . . Are these linked at all? Is there kind of some recurring theme here that you guys think you need to invest in for quality?" Defendant Drazin responded:

> I mean, ***there's no recurring theme. There's nothing systemic at all that we would be worried about***. But we do, as I mentioned earlier, we are taking product quality

> very seriously. . . . So the reality of the matter is we are focused on improving our quality, make sure we have the highest quality. We're investing in it. ***But we do not think this is systemic.***

45. When asked about the financial impact of the warning letter, Defendant Drazin stated that "when we have things like product recalls, which we've had in the past, ***so far, none of those have been material to our overall financial statement.***"

46. On June 9, 2026, Defendants Boyle and Drazin appeared on behalf of Medline at the Goldman Sachs Global Healthcare Conference. Asked "[w]hy isn't this a bigger problem? How does this not metastasize," Defendant Boyle stated that "the warning letter ***was not a surprise, it's anticipated***," and further stated:

> So, from a quality perspective, we take it very seriously. We have over 2,700 people in quality across the globe and we invest hundreds of millions of dollars in the organization. . . . ***And we're working very closely with the FDA to make sure we're not only meeting, but exceeding their expectations.***

47. When asked "how should we think about the financial impact or financial risk associated with the shutdown of the Waukegan plant and just quality remediation in general," Defendant Boyle responded: "***It's not going to be material to our numbers***. Every recall we've had this year has been small and it won't be material to our numbers and ***we're still confident in our guidance***."

48. The statements referenced in ¶¶44-47 were materially false and misleading, and omitted material facts, for the reasons set forth in ¶36, *supra*. In addition, Medline's quality deficiencies were recurring and systemic and the Company's quality remediation was material.

### D. The Truth Is Fully Revealed

49. On August 5, 2026, Medline announced its second quarter 2026 financial results and hosted a conference call with investors and analysts (the "Q2 2026 Earnings Call"). Medline announced that it was lowering its full-year 2026 Adjusted EBITDA outlook to $3.3 billion to $3.4

billion, from $3.5 billion to $3.6 billion, a reduction of $200 million, or approximately 5.6%, at the midpoint.

50. During his prepared remarks, Defendant Boyle identified "quality remediation efforts" as one of the drivers of the reduced outlook and revealed for the first time the existence of a company-wide quality remediation program:

> Patient safety and product quality remain our highest priority. We continue to undertake remediation activities, strengthen our quality organization, enhance our manufacturing processes and work to reintroduce recalled products to market.
>
> ***For the past couple of months, we have proactively engaged with the FDA to discuss and launch our global quality action plan.*** To further strengthen our quality organization, we are investing in people, processes and technology, and accelerating these initiatives to support growth and better position Medline for future demand.
>
> As part of this work, ***we have also modified our complaint review process, which we expect will increase medical device reporting or MDR submissions in the second half of the year.*** Our updated guidance reflects our current expectations of these investments and remediation efforts.

51. Defendant Drazin added:

> As Jim mentioned in his opening remarks, we discussed our global quality action plan with the FDA. ***We've identified and quantified expected remediation costs, which include enhancements in our quality organization and investments in our manufacturing network. In addition, a portion of the impact relates to products that were taken off the market due to recalls and/or FDA inspection findings.***
>
> Based on our latest assessment, some of those products, including our CHG wipes, manufactured at our Waukegan facility, are taking slightly longer than originally expected to complete the necessary work to bring back online, which results in earnings loss.

52. Defendant Drazin further disclosed that internal factors, "including operational investment, quality remediation efforts and softness in retail," accounted for approximately 75% of the reduction in Adjusted EBITDA guidance, and that roughly half of the incremental earnings impact from the factors driving the reduction "is more permanent and will become part of our future cost base."

53. On this news, Medline's stock fell $7.53 per share, or approximately 17.9%, over two consecutive trading sessions, to close at $34.51 per share on August 6, 2026.

54. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## V. ADDITIONAL SCIENTER ALLEGATIONS

55. During the Class Period, Defendants acted with scienter in that they knew, or recklessly disregarded, that the public documents and statements they issued or disseminated to the investing public during the Class Period were materially false or misleading. Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as well as actions intended to manipulate the market price of Medline common stock, as primary violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding Medline and their control over, receipt, and/or modification of Medline's materially false and misleading statements, were active and culpable participants in the fraudulent scheme alleged herein.

56. Defendants knew or recklessly disregarded the false and misleading nature of the information regarding Medline's quality systems issues. Medline had received at least four Form 483s over the course of 2025, resulting from the FDA's inspections of various Medline facilities. These Form 483s notified the Company and the Individual Defendants of the widespread quality system issues well in advance of the 2026 warning letters.

57. Given their positions within Medline, the Individual Defendants controlled the contents of Medline's public statements during the Class Period. The Individual Defendants were each provided with, or had access to, the statements alleged herein to be false and misleading prior to, or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.

58. Because of their positions and access to material nonpublic information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations that were being made were false and misleading. Each of the Defendants is responsible for the accuracy of Medline's corporate statements, and is, therefore, responsible and liable for the representations contained therein.

## VI. LOSS CAUSATION

59. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

60. During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions and engaged in a scheme to deceive the market. This artificially inflated the price of Medline common stock and operated as a fraud or deceit on the Class (as defined below). Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market, the price of Medline common stock fell precipitously as the prior artificial inflation came out of the price. As a result of their acquisition of Medline common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, i.e., damages, under the federal securities laws.

## VII. PLAINTIFF'S CLASS ACTION ALLEGATIONS

61. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons and entities that purchased or otherwise acquired Medline Class A common stock during the Class Period (the "Class"), and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

62. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Medline common stock was actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Medline or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

63. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

64. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

65. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, quality systems, and regulatory compliance of Medline;

(c) whether the Individual Defendants caused Medline to issue false and misleading statements during the Class Period;

(d) whether Defendants acted knowingly or recklessly in issuing false and misleading statements;

(e) whether the prices of Medline common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

66. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

67. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) the omissions and misrepresentations were material;

(c) Medline common stock is traded in an efficient market;

(d) the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

(e) the Company traded on the NASDAQ, filed periodic reports with the SEC, and was covered by numerous analysts employed by major brokerage firms;

(f) the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(g) Plaintiff and members of the Class purchased, acquired and/or sold Medline common stock between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

68. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

69. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## VIII. NO SAFE HARBOR

70. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions, including the present state of Medline's quality systems, its regulatory compliance, and the financial impact of known quality issues. To the extent any statement alleged herein could be deemed forward-looking, it was not identified as such when made, was not accompanied by meaningful cautionary language identifying important factors that could cause actual results to differ materially, and/or was made with actual knowledge of its falsity by a speaker who knew, or by an executive officer of Medline who approved the statement and knew, that it was false or misleading when made.

## IX. CLAIMS FOR RELIEF

### COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

71. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

72. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

73. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Medline common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Medline common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

74. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the annual reports, SEC filings, conference call statements, and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Medline common stock. Such reports, filings, and statements were

materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Medline's quality systems, regulatory compliance, finances, and business prospects.

75. By virtue of their positions at Medline, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

76. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers of Medline, the Individual Defendants had knowledge of the details of Medline's internal affairs.

77. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Medline. As officers of a publicly held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Medline's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, filings, and public statements, the market price of Medline common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Medline's business and financial condition which were concealed by

Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Medline common stock at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

78. During the Class Period, Medline common stock was traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Medline common stock at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Medline common stock was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Medline common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

79. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

80. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and acquisitions of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

81. Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

82. During the Class Period, the Individual Defendants participated in the operation and management of Medline, and conducted and participated, directly and indirectly, in the conduct of Medline's business affairs. Because of their senior positions, they knew the adverse non-public information about Medline's deficient quality systems, its regulatory noncompliance, and the financial impact of required remediation.

83. As officers of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Medline's financial condition and results of operations, and to correct promptly any public statements issued by Medline which had become materially false or misleading.

84. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases, public filings, and conference call statements which Medline disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Medline to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Medline within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Medline common stock.

85. Each of the Individual Defendants, therefore, acted as a controlling person of Medline. By reason of their senior management positions each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Medline to engage in the

unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Medline and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

86. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Medline.

## X. PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## XI. JURY DEMAND

Plaintiff hereby demands a trial by jury in this action of all issues so triable.

DATED: November 24, 2026

**GAIDO & FINTZEN**
RONALD L. SANDACK

*s/ Ronald L. Sandack*
RONALD L. SANDACK

20 South Clark Street, Suite 510
Chicago, IL 60603
Telephone: (312) 346-7855
ronald@gaido-fintzen.com

**SCHALL, BROWN & SCHWARTZ LLP**
BRIAN O. O'MARA
501 W. Broadway, Suite 1490
San Diego, CA 92101
Telephone: (310) 301-3335
omara@schallfirm.com

**SCHALL, BROWN & SCHWARTZ LLP**
ADAM ROSEN
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Telephone: (310) 301-3335
adam@schallfirm.com

*Attorneys for Plaintiff*